**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **VLADIMIR GORGADZE, et al.,** | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 21-2421 (JDB)** |
| **ANTHONY BLINKEN, Secretary of State, et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Vladimir Gorgadze is a Russian national who was selected to participate in the annual Diversity Visa ("DV") program for the 2021 fiscal year ("DV21"). He, his wife (plaintiff Elena Petukhova), and his minor son (plaintiff Mikhail Gorgadze), submitted visa applications in August 2020 in hopes that they would be selected for three of the 55,000 DVs available for DV21. However, plaintiffs have not been contacted by U.S. immigration officials regarding the status of their applications since they submitted the required documentation in January 2021. On September 14, just sixteen days before the September 30, 2021 statutory deadline for the issuance of DVs under DV21, plaintiffs filed the instant action seeking a temporary restraining order requiring the government to immediately interview them and adjudicate their applications or to set aside DVs for them to be adjudicated after the close of the 2021 fiscal year. The government has moved to dismiss the complaint, arguing that plaintiffs lack standing and have failed to state a claim on which relief can be granted. Because plaintiffs have not met the high bar for obtaining the emergency relief sought, the Court will deny their motion for a temporary restraining order without ruling on the government's motion to dismiss at this time.

1

## Background

### I.  The Diversity Visa Program

Congress established the DV program under the Immigration and Nationality Act ("INA"), "provid[ing] for up to 55,000 immigrant diversity visas to be distributed each fiscal year to foreign nationals that hail from countries with historically low levels of immigration to the United States." Filazapovich v. Dep't of State, No. 21-cv-943 (APM), 2021 WL 4127726, at *2 (D.D.C. Sept. 9, 2021) (citing 8 U.S.C. §§ 1151(e), 1153(c)).   Unsurprisingly, millions of would-be immigrants apply for the program each year to vie for one of the 55,000 annual DVs.   Id. (citing Gomez v. Trump ("Gomez I"), 485 F. Supp. 3d 145, 159 (D.D.C. 2020)).   For example, "in Fiscal Year 2018 there were approximately 14.7 million qualified entries."   Gomez I, 485 F. Supp. 3d at 159.

Among those millions, a much smaller number of "selectees" are picked at random by lottery and given the opportunity to apply for DVs for themselves and their dependent immediate family members.   See 22 C.F.R. § 42.33(c); U.S. Dep't of State Bureau of Consular Affs., Instructions for the 2022 Diversity Visa Program at 5–6 (last visited Sept. 29, 2021), https://travel.state.gov/content/dam/visas/Diversity-Visa/DV-Instructions-Translations/DV-2022-Instructions-Translations/DV-2022-Instructions-and-FAQs_English.pdf.   Each selectee then "submit[s] an application and various documents to be eligible for a visa number."   Almaqrami v. Pompeo, 933 F.3d 774, 776–77 (D.C. Cir. 2019).   Once the selectee is assigned a visa number, he or she must complete Form DS-260 and submit scanned copies of all required supporting documents (birth certificates, police records, military records, etc.) to the Kentucky Consular Center ("KCC").   See 9 Foreign Affs. Manual ("FAM") § 502.6-4(d)(1).   KCC reviews the submitted materials, notifies the applicant of any missing or illegible documents, and screens for potential inconsistencies or indications of fraud.   Id.   If the submitted materials are complete and

accurate, KCC will deem the application "documentarily qualified" and schedule the applicant for an interview at his or her local consular office when his or her lottery number is "about to become current."  Id. § 502.6-4(c)(2)(c), (d)(2); see also 8 U.S.C. § 1202(b).

"[T]he availability of interview appointments may depend on the available resources and competing demands of consulates in an applicant's country of residence."  Gjoci v. Dep't of State, Case No. 1:21-cv-00294-RCL, 2021 WL 3912143, at *2 (D.D.C. Sept. 1, 2021).  Interviews for documentarily qualified lottery selectees are "scheduled in order of their rank number" with the consular post corresponding to the selectee's country of residence.  Id.  "KCC uses the [applicant's randomly assigned] rank number, as is required by statute, to determine the order in which cases are eligible to be scheduled for appointments."  Decl. of Morgan Miles ("Miles Decl.") [ECF No. 11-3] ¶ 6.  Accordingly, "DV selectees with a low rank order, as reflected in their case number, are more likely to get the opportunity to interview, while those with higher numbers are less likely to be scheduled."  Id.; see also 22 C.F.R. § 42.33(e).  After processing the application and confirming the applicant's eligibility through the interview, "the State Department 'shall' issue . . . a diversity visa" to the applicant and qualifying dependents.  Almaqrami, 933 F.3d at 777 (quoting 8 U.S.C. § 1153(c)); see also 22 C.F.R. §§ 40.6, 42.33(d), 42.81(a).  However, no DVs may be issued after the end of the fiscal year for which the application was submitted.  22 C.F.R. § 42.33(a)(1), (d), (f); 8 U.S.C. § 1154(a)(1)(I)(ii)(II).  "If the selectee does not receive a visa by the end of the fiscal year, . . . he is out of luck."  Gomez I, 485 F. Supp. 3d at 159; see also Almaqrami, 933 F.3d at 777.

As this scheme makes clear, "[t]hose selected for the [DV] program are not guaranteed to receive a visa—only the opportunity to apply for one."  P.K. v. Tillerson, 302 F. Supp. 3d 1, 3 (D.D.C. 2017).  Indeed, each year there are far more applicants selected for the program than DV

recipients.   Under DV21, for example, there were 71,817 principal selectees; including their dependents, the total "selectee" applicant pool was 137,969 vying for just 54,850 DVs.   Miles Decl.   ¶   4;   U.S.   Dep't   of   State,   Visa Bulletin for Oct. 2020   (Sept.   8,   2020), https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2021/visa-bulletin-for-october-2020.html.

## II. Diversity Visa Processing in Russia During the COVID-19 Pandemic

Even before the COVID-19 pandemic, the State Department's overall capacity in Russia was severely curtailed over a number of years, impacting its ability to process and issue DVs to Russian nationals like plaintiffs.   In 2017, "the U.S. Mission to Russia had to reduce staff by approximately two thirds."  Decl. of Francis Chris Lanning ("Lanning Decl.") [ECF No. 11-2] ¶ 8. Since that time, due to expulsions apparently unrelated to COVID-19, the number of consular officers in Moscow has dwindled to just seven.   Id.   And three of the four consular facilities in Russia have closed, concentrating all operations at the U.S. Embassy in Moscow.   Id. ¶ 10.

The pandemic has greatly exacerbated the effects on U.S. visa processing both globally and locally.  In March 2020, at the onset of the global COVID-19 pandemic, the State Department suspended all routine visa processing services, including under DV21.   Id.   ¶ 2.   The following month, then-President Trump issued Presidential Proclamation 10014, which temporarily suspended the entry of immigrants into the United States pursuant to 8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a).   Proclamation No. 10014, 85 Fed. Reg. 23,441 [ECF 4-10] (Apr. 27, 2020).[1] "Although these Proclamations provided certain exceptions in 'the national interest' to the general suspension of immigrant entry, there was 'no specific national interest exception[] available for diversity visa applicants[.]'"  Pushkar v. Blinken, Civ. A. No. 21-2297 (CKK), 2021 WL 4318116,

---

[1] This suspension was subsequently extended through March 31, 2021 by Proclamation No. 10052, 85 Fed. Reg. 38,263, (June 25, 2020), and Proclamation No. 10131, 86 Fed. Reg. 417 (Dec. 31, 2020).

at *2 (D.D.C. Sept. 23, 2021) (quoting Gomez I, 485 F. Supp. 3d at 162). And in response to the presidential directive to suspend entry, the State Department suspended all visa-issuance outside of "mission critical categor[ies]" as well. Id. This resulted in a complete shutdown on adjudication of DV applications because—if no DV beneficiaries would be permitted to enter the U.S., it would be "a waste of scant resources" to "reserve a limited number of interview spots for them ultimately to be refused a visa." See Decl. of Brianne Marwaha [ECF No. 4-5] ¶ 5. As a result, the DV21 lottery was postponed, but the State Department indicated its intention to resume DV21 interviews on schedule in October 2020. See U.S. Dep't of State, DV-2021 Entrant Status Check Announcement (Apr. 27, 2020) [ECF No. 4-6].

In July 2020, the State Department initiated a "phased resumption of routine services," Lanning Decl. ¶ 2, which prioritized processing multiple family-related categories of immigration beneficiaries over DV21 applicants, see id. Ex. 1 at 2; id. Ex. 2 at 4. In November 2020, the State Department issued prioritization guidance "to inform decision-making as [consular] posts attempted to resume full routine services." Lanning Decl. ¶ 3. The November 2020 guidance once again followed "a tiered and hierarchical approach," which "recogniz[ed] that some family preference, employment preference, and diversity visa cases should be scheduled and adjudicated each month, to the extent [a] post has capacity." Id. Ex. 3 at 1–2. Still, the November guidance placed DVs in the lowest-priority fourth tier. Id. at 2. President Biden rescinded Proclamation 10014 on February 24, 2021, but the November 2020 prioritization guidance remained in effect. See Proclamation No. 10149, 86 Fed. Reg. 11847 (Mar. 1, 2021).

Meanwhile, regardless of the global prioritization guidance, Embassy operations in Moscow were ground to a halt for much of 2020, and things have not gotten much better in 2021. "[A]ll local staff work[ed] from home from March 2020 until autumn of that year," while "[a]ll

consular officers . . . were reassigned to the American Citizen Services Unit, to focus on assisting thousands of U.S. citizens to depart Russia." Lanning Decl. ¶ 7. "A second COVID-19 wave in November 2020 caused the suspension of services again, lasting until Spring 2021." Id. And not until April 2021—more than halfway through the fiscal year—did regular interviews for immigrant visas resume subject to the non-pandemic resource constraints described above. Id. Around the same time, on April 23, the Russian government barred the U.S. Mission to Russia from employing Russian nationals effective May 23, 2021, reducing the already-anemic staffing levels by a devastating seventy-five percent and thrusting much of the operational and administrative responsibilities formerly handled by local staff onto consular officers. Id. ¶ 9.

Unsurprisingly, the backlogs have piled up across multiple visa categories worldwide, and in Russia in particular—especially in tier-four categories like DVs. As of the end of August 2021, more than half a million immigrant visa applicants whose cases are documentarily complete were waiting to be scheduled for interviews. See U.S. Dep't of State Bureau of Consular Affs., National Visa Center (NVC) Immigrant Visa Backlog Report (last visited Sept. 29, 2021), https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visas-backlog.html. Only 25,561 of those were scheduled for interviews in September. Id. In Moscow, there are substantial backlogs of thousands of documentarily qualified applications across multiple higher-priority categories of immigrant visas. See Decl. of Rebecca Austin ("Austin Decl.") [ECF No. 11-5] ¶¶ 5–8. Moscow only had capacity to conduct 32 total immigrant visa interviews in the entirety of fiscal year 2021. Id. ¶ 4. None of those 32 interviews were slotted to the 3,176 Moscow DV21 selectees (representing 6,893 applicants, including dependents of those selectees), meaning that zero DV21 applications have been adjudicated by the U.S. Mission to Russia. See Miles Decl. ¶ 4.

However, there have been several DV21 adjudications outside of Russia.  Between March 1 and September 21, 2021, the Department of State adjudicated 15,481 DV applications.  See Decl. of Brenda L. Grewe ("Grewe Decl.") [ECF No. 11-4] ¶ 4.  An additional 21,092 applicants were scheduled for interviews, and over 16,073 applicants had completed all processing steps and were waiting to schedule interview appointments.  Miles Decl. ¶¶ 12–13.  The clock is certainly ticking down to the September 30 cutoff date, but these numbers indicate that a considerable chunk—if not all—of the 55,000 available DV21 visas will ultimately end up being disbursed.

### III. Plaintiffs' Applications and the Instant Action

Plaintiff Vladimir Gorgadze was notified of his selection for DV21 on June 6, 2020. Compl. [ECF No. 1] ¶ 1.  He, his wife, Elena Petukhova, and their minor son, Mikhail Gorgadze, submitted DS-260 applications electronically to KCC on August 18, 2020.  Id. ¶¶ 2, 3, 33. Plaintiffs submitted the required accompanying documentation for their applications on January 6, 2021.  Id. ¶ 34.  Their applications have not yet been deemed "documentarily qualified" for adjudication.  See Miles Decl. ¶ 19.  But their lottery number did become "current" on May 1, 2021.  Id. ¶ 17; Compl. ¶ 35.  Had their applications been documentarily qualified by that date, they would have been eligible to schedule an interview.  But despite several inquiries about the status of their applications, plaintiffs have not been scheduled for an interview or otherwise advised about the possibility of scheduling an interview at a consular post outside of Russia.  See Aff. of Vladimir Vyacheslavovich Gorgadze [ECF No. 10] ¶¶ 12–15.

Now, defendants have submitted evidence regarding plaintiffs' place in line for DV21 adjudication.  According to defendants, the U.S. Embassy in Moscow had completed document review of only twenty-two DV applications which were awaiting interview slots as of May 1, 2021, when plaintiffs' lottery number became current.  Miles Decl. ¶ 18.  As of September 23, 2021,

there were 596 cases representing 1,375 applicants that were documentarily qualified and awaiting interview slots in Moscow.  Id. ¶ 19.  Those applications thus represent the "front" of the line. Among the 1,604 cases (representing 3,719 applicants) that—like plaintiffs'—are not yet documentarily qualified, there are 490 lottery numbers ahead of plaintiffs' in the queue, representing 1,107 applicants.  Id. ¶ 20.

Plaintiffs filed the instant action under the Administrative Procedure Act ("APA") on September 14, 2021—approximately two weeks before the statutory deadline for issuing DV21 visas.  See Compl. at 16.  On September 17, they filed a motion for a temporary restraining order and/or preliminary injunction, asserting that (1) the November 2020 prioritization plan "and the exclusion of DV applicants from 'mission critical' and 'emergency' services are arbitrary and capricious," and (2) defendants have "unreasonably delayed" processing plaintiffs' DV21 applications.  See Pls.' Mem. of Law in Supp. of Emergency Mot. for TRO & Prelim. Inj. ("TRO Br.") [ECF No. 4-1] at 10, 13.  Plaintiffs seek an emergency order from this Court "compelling Defendants to take steps to immediately process Plaintiffs' DV applications, schedule Plaintiffs' visa interviews at a U.S. Consulate open and available, adjudicate their DV applications before the statutory deadline on September 30, 2021, or otherwise reserve DV immigrant visas for Plaintiffs beyond September 30, 2021" for as long as is necessary to adjudicate their applications.  Pls.' Emergency Mot. for TRO & Prelim. Inj. [ECF No. 4] at 1–2.

Defendants oppose plaintiffs' motion and move to dismiss for lack of standing and failure to state a claim.  See Mem. of P. & A. in Supp. of Defs.' Cross-Mot. to Dismiss & Opp'n to Pls.' Mot. for TRO & Prelim. Inj. ("Defs.' Opp'n & MTD") [ECF No. 11-1] at 2–3.  Plaintiffs' TRO motion is now fully briefed and ripe for this Court's consideration.  Because plaintiffs cannot meet the demanding standard for the emergency relief they request, the Court will deny their motion.

However, given the complexity of the issues raised and the compressed timeline for consideration ahead of the September 30, 2021 deadline, the Court will defer decision on defendants' motion to dismiss at this time.

**Analysis**

## I.  **Legal Standard**

### A.  Standing

Before a court can reach the merits of a case, it must satisfy itself that it has jurisdiction to do so under Article III of the Constitution.  Relevant here, Article III imposes an "'irreducible constitutional minimum' of standing," which requires a plaintiff to demonstrate: "(1) an 'injury in fact' that is 'concrete and particularized' as well as 'actual or imminent'; (2) a 'causal connection' between the injury and the challenged conduct; and (3) a likelihood, as opposed to mere speculation, 'that the injury will be redressed by a favorable decision.'"  Ark Initiative v. Tidwell, 749 F.3d 1071, 1075 (D.C. Cir. 2014) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)); see also Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).

Where, as here, "plaintiffs sue based on a 'procedural injury'—or the agency's failure to act according to an applicable statutory or regulatory framework—that claim 'must be tethered to some concrete interest adversely affected by the procedural deprivation: '[A] procedural right in vacuo . . .  is insufficient to create Article III standing.'"  Aminjavaheri v. Biden, No. 1:21-cv-2246-RCL, 2021 WL 4399690, at *6 (D.D.C. Sept. 27, 2021) (quoting WildEarth Guardians v. Jewell, 738 F.3d 298, 305 (D.C. Cir. 2013)).  Hence, to establish an imminent injury premised on a procedural harm sufficient to sustain Article III standing, plaintiffs must "show 'both (i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account" resulting from the challenged agency action or inaction.  Food & Water Watch,

Inc. v. Vilsack, 808 F.3d 905, 914 (D.C. Cir. 2015) (quoting Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin., 489 F.3d 1279, 1289 (D.C. Cir. 2007)).  "'In applying this standard,' the court must bear in mind 'that the constitutional requirement of imminence as articulated by the Supreme Court necessarily compels a very strict understanding of what increases in risk and overall risk levels count as substantial.'"  Filazapovich, 2021 WL 4127726, at *9 (quoting Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin., 513 F.3d 234, 237–38 (D.C. Cir. 2008)).

###### B.  Temporary Restraining Order/Preliminary Injunction

A temporary restraining order "is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Postal Police Officers Ass'n v. U.S. Postal Serv., 502 F. Supp. 3d 411, 418 (D.D.C. 2020) (quoting Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004)).  Courts analyze motions for temporary restraining orders by reference to the same four factors governing the issuance of preliminary injunctions. See, e.g., Gordon v. Holder, 632 F.3d 722, 723–24 (D.C. Cir. 2011); Sibley v. Obama, 810 F. Supp. 2d 309, 310 (D.D.C. 2011).

In turn, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24 (2008).  Before a preliminary injunction may issue, a plaintiff "must make a 'clear showing' that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in [their] favor, and accord with the public interest." Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 505 (D.C. Cir. 2016) (quoting Winter, 555 U.S. at 22).  But not all of the four factors weigh equally: "[t]he first two factors are paramount in the preliminary injunction analysis." McCutcheon v. FEC, 496 F. Supp. 3d 318, 329 (D.D.C. 2020).  "[W]ithout a likelihood of success on the merits, [p]laintiffs are not entitled to a preliminary injunction regardless of their

showing on the other factors." Brown v. FEC, 386 F. Supp. 3d 16, 24 (D.D.C. 2019) (citing Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric., 573 F.3d 815, 832 (D.C. Cir. 2009)); see also Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d 1, 10 (D.C. Cir. 2019) ("A foundational requirement for obtaining preliminary injunctive relief is that the plaintiffs demonstrate a likelihood of success on the merits.").  "Extrapolating from the requirement that a plaintiff seeking a preliminary injunction must show a 'substantial likelihood of success on the merits,' the D.C. Circuit has held that 'a party who seeks a preliminary injunction must show a 'substantial likelihood' of standing.'" Gjoci, 2021 WL 3912143, at *9 (quoting Food & Water Watch, 808 F.3d at 913).  Because plaintiffs here have failed to show a substantial likelihood of standing—let alone a substantial likelihood of success on the merits of their claims—the Court need not reach the other factors.

## II. Likelihood of Success on the Merits

Plaintiffs assert three causes of action to challenge defendants' failure to adjudicate their DV applications.  First, they argue that "[d]efendants' [p]rioritization [p]lan and the exclusion of DV applicants from 'mission critical' and 'emergency' services are arbitrary and capricious and are conducted without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(A) and (D).  See TRO Br. at 10.  Next, they contend that defendants have "unlawfully withheld or unreasonably delayed" adjudication of their DV applications in contravention of 5 U.S.C. § 706(1).  See id. at 13.  Finally, and relatedly, they assert that they are entitled to mandamus relief directing defendants to act on their applications or otherwise reserve their right to DV benefits.  See id. at 15–16.  Plaintiffs have not shown a likelihood of success on the merits of any of these claims, due in large part to their apparent failure to establish standing.

A.  <u>Arbitrary and Capricious Review of Past Directives and Present Prioritization</u>

Plaintiffs first state that defendants acted arbitrarily and capriciously when they (1) excluded DV applicants from "mission critical" and "emergency" services under presidential proclamation 10014, and (2) placed DV processing in the lowest tier of the November 2020 prioritization plan.  <u>Id.</u> at 10–11.  Neither assertion is likely to present a justiciable question for the Court to consider.

Plaintiffs' challenges to the now-defunct Proclamation 10014 and the pre-November prioritization plans promulgated thereunder cannot make it past the starting gate.  In challenging the exclusion of DV applications from "mission critical" services, plaintiffs rely largely on Judge Mehta's September 2020 decision in <u>Gomez I</u>, which held that the exclusion of DV applicants from "'mission critical' visa services [was] arbitrary and capricious because . . . it [did] not reflect any 'meaningful consideration to the exceptionally harsh result of failing to issue visas to diversity lottery winners.'"  485 F.3d at 198 (citation omitted).  As plaintiffs concede, though, "the current U.S. administration revoked Presidential Proclamation 10014" in February 2021, TRO Br. at 11, and DV processing resumed even earlier when the "mission critical" prioritization scheme was superseded by the November 2020 prioritization plan, Lanning Decl. ¶ 3.  Moreover, plaintiffs' lottery number did not become "current" until May 2021, well after the proclamation and "mission critical" guidance had been rescinded.  <u>See</u> Compl. ¶ 35.  Several courts in this District—including Judge Mehta in a subsequent ruling—have since held that Article III justiciability doctrines preclude jurisdiction over the rescinded Proclamation 10014 and pre-November 2020 prioritization scheme.  <u>See, e.g.</u>, <u>Filazapovich</u>, 2021 WL 4127726, at *21 ("The court lacks jurisdiction to entertain challenges to . . . rescinded policies."); <u>id.</u> at *8 ("The injury-in-fact inquiry in these cases differs fundamentally from that in <u>Gomez</u>."); <u>Gjoci</u>, 2021 WL 3912143, at

*9–11 (holding that claims against rescinded policies "are not justiciable because there is no effective relief that the Court can grant—the policies no longer govern processing"); Rai v. Biden, Civ. A. No. 21-cv-863-TSC, 2021 WL 4439074, at *12 (D.D.C. Sept. 27, 2021) (dismissing claims as to "mission critical guidance policy").  Likewise here.

By the same logic, although defendants have not developed any argument on point in their opposition brief, plaintiffs are highly unlikely to establish standing to challenge the November 2020 prioritization scheme because it, too, had been invalidated before plaintiffs filed suit, albeit more recently and by court order.  On September 9, 2021, in Filazapovich, Judge Mehta ordered that "[t]he November 2020 prioritization policy is preliminarily enjoined as to DV-2021 selectees and their derivative beneficiaries."  2021 WL 4127726, at *26.  Accordingly, "[d]efendants may not rely on the November 2020 prioritization policy to foreclose or prohibit embassy personnel, consular officers, or any administrative processing center (such as the KCC) from processing, reviewing, or adjudicating a 2021 [DV] or derivative beneficiary application."  Id.  Moreover, the order made clear that it did not prioritize the processing of the plaintiffs in Filazapovich and the other cases consolidated therewith; instead the ruling applied generally to all DV21 selectees "out of 'respect [for] Congress's decision that the processing of diversity visas proceed in a random order.'"  Id. (quoting Gomez v. Biden, Case No. 20-cv-01419 (APM), 2021 WL 3663535, at *24 (D.D.C. Aug. 17, 2021) ("Gomez III")).  Instead, the Filazapovich order commanded defendants to "undertake good-faith efforts . . . to expeditiously process and adjudicate DV-2021 applications and derivative beneficiary applications by September 30, 2021."  Id.  Hence, the relief granted to plaintiffs in Filazapovich is equally applicable to plaintiffs here.  And the State Department has acknowledged its implementation of the Filazapovich court's September 9 order on its website, indicating that it "has instructed consular sections to make every effort within their discretion and

subject to posts' resource constraints, limitations due to the COVID-19 pandemic, and country conditions to prioritize the scheduling and adjudication of additional DV-2021 cases by September 30." See U.S. Dep't of State Bureau of Consular Affs., Diversity Visa 2021 Update (Sept. 12, 2021), https://travel.state.gov/content/travel/en/News/visas-news/diversity-visa-2021-update.html.

Under 5 U.S.C. § 706(2), even if this Court were to find the challenged prioritization policies to be arbitrary and capricious, it would be limited to fashioning relief having the effect of simply "hold[ing] unlawful and set[ting] aside" the offending policies.  But Judge Mehta has already done that in Filazapovich.  Thus, it is not clear to this Court—and plaintiffs have not suggested—what further individualized relief the Court could grant under § 706(2).  To be sure, in their reply brief, plaintiffs all but abandon hope that defendants will adjudicate their applications before the clock strikes midnight on September 30, clinging instead to "[t]he possibility that the court could reserve visas for [them]" beyond the statutory deadline.  See Pls.' Reply in Supp. of Mot. for TRO & Prelim. Inj. & Opp'n to Defs.' Cross-Mot. to Dismiss ("Pls.' Reply") at 13 (quoting Filazapovich, 2021 WL 4127726, at *14).  But that form of relief stems more from plaintiffs' § 706(1) claims, discussed below, which ask the Court to compel action by defendants; reserving visas beyond the deadline bears little connection to plaintiffs' prayer that the Court "hold unlawful and set aside" the operative prioritization scheme under § 706(2).  It is well established that "a plaintiff must demonstrate standing for each claim he seeks to press."  See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006) (citing Allen v. Wright, 468 U.S. 737, 752 (1984).  Hence, even assuming the Court were to agree with plaintiffs and Judge Mehta that the November 2020 prioritization scheme is arbitrary and capricious, absent any cogent theory of redressability as

required to show standing, the Court cannot conclude that plaintiffs are likely to succeed on the merits of their § 706(2) claims under the APA.

B.   <u>Unlawful Withholding or Unreasonable Delay of DV Adjudication</u>

Plaintiffs' remaining claims under § 706(1) of the APA and the Mandamus Act both rely on the assertion that defendants have unreasonably delayed and unlawfully withheld adjudication of their DV21 applications.  <u>See</u> TRO Br. at 13–15.  Because the "standard for undue delay under the Mandamus Act . . . is identical to the APA standard," <u>Kangarloo v. Pompeo</u>, 480 F. Supp. 3d 134, 142 (D.D.C. 2020), the Court will consider these claims together.  Once again, plaintiffs have not satisfied their burden of showing a substantial likelihood of standing to press these claims.

Plaintiffs insist they have standing to pursue their unreasonable delay claims on the theory that the combination of defendants' "mission critical" prioritization scheme, the November 2020 prioritization plan, "and wrongful reliance on [Proclamation] 10014 to refuse processing and adjudication of DV applications for a nearly five-month period . . . substantially increased Plaintiffs' risk of not receiving an adjudication of their DV applications" within the fiscal year. Pls.' Reply at 7.  To determine whether this is true in plaintiffs' particular case, it bears comparing their factual circumstances to those considered by other courts assessing unreasonable delay claims brought by DV21 applicants based on similar theories of standing.  <u>See, e.g.</u>, <u>Filazapovich</u>, 2021 WL 4127726, at *9.   As Judge Lamberth recently explained in <u>Aminjavaheri</u>, "whether defendants' actions 'substantially increased the risk' that plaintiffs will not have their visa application adjudicated by September 30 'depends on, among other things, the priority number of the particular applicant, whether they were documentarily qualified, and the conditions at the consulate where the selectee's application would be processed.'"  2021 WL 4399690, at *8 (quoting <u>Gjoci</u>, 2021 WL 3912143, at *13).  Under this framework, the better a plaintiff's luck-

of-the-draw chances of securing a visa under DV21 by reference to these factors, the more likely that plaintiff's risk of non-adjudication can be said to have substantially increased as a result of the challenged policies.  See id.  So on the one hand, a plaintiff who "became eligible for an interview less than two months into the fiscal year" but had "no immediate prospect of an interview in sight" less than a month before the expiration of the fiscal year could make a sufficient showing under the substantial likelihood test.  See Filazapovich, 2021 WL 4127726, at *9.  On the other hand, plaintiffs like the ones here "who were not eligible for an interview until May [] 2021—after Defendants had resumed processing visas—[did not] demonstrate[] that Defendants' actions substantially increased the risk that their visa applications will not be adjudicated."  Id. at *11.  In the latter situation, the Filazapovich court declined to attribute plaintiffs' failure to become documentarily qualified until late in the fiscal year to defendants in light of evidence that KCC had already begun reviewing documents in order of lottery number as early as June 2020.  Id. at *11–12; see also Aminjavaheri, 2021 WL 4399690, at *9 (finding no standing where plaintiffs lottery numbers did not become "current" and documentarily qualified until July 2021).

Plaintiffs here fall squarely into this category, and are thus unlikely to establish standing.  For one, their applications did not become current until May 2021, after DV21 processing had resumed.  See Aminjavaheri, 2021 WL 4399690, at *9 ("This Court previously expressed skepticism as to whether an applicant whose number became current after processing resumed would have standing to challenge these policies." (citing Gjoci, 2021 WL 3912143, at *13)).  Further, their applications were never deemed documentarily qualified by KCC, nor did they submit any evidence that KCC's delay in processing their documents was unreasonable.  For their part, defendants have submitted evidence that KCC had completed document processing for over 37,000 DV21 applicants as of mid-September 2021, including at least 1,375 applicants currently

awaiting interview slots in Moscow.  See Miles Decl. ¶¶ 12–13, 19.  Unfortunately for plaintiffs, then, the genesis of their plight cannot be found in either defendant's challenged policies or in unreasonable delay by KCC.

Finally, plaintiffs attempt to challenge as unreasonable the failure of the Moscow post to adjudicate any DV21 applications.   In effect, plaintiffs' argument focuses exclusively on countering the proposition that the Moscow post's failure to adjudicate DV21 visas was not solely due to the actions of the Russian government restricting U.S. diplomatic activities as recounted in defendants' motion.  See Pls.' Reply at 10–12.  Plaintiffs are surely correct that the Russian government is not alone to blame for the cessation of DV21 processing in Moscow, but defendants' evidence makes clear that the Kremlin's restrictions, combined with the extremely disruptive effects of an unprecedented global pandemic, have created the circumstances precluding DV21 adjudication in that country.  See, e.g., Defs.' Opp'n & MTD at 22–24.  Indeed, from March–September 2021, a paltry 593 total immigrant visas have been adjudicated in Moscow—an 85% decrease from the same period in 2019—and just 32 new visa interviews (presumably in higher-priority, family-based categories) were held.  See Grewe Decl. ¶ 5; Austin Decl. ¶ 4.  What's more, plaintiffs are not close to the "front of the line" for Russian DV21 applicants—more than a thousand applicants have lower lottery numbers and are hence "ahead of" plaintiffs, see Miles Decl. ¶ 19, and those applicants will also almost certainly miss out on the opportunity to obtain a DV this fiscal year.  The Court sympathizes with plaintiffs' unenviable position, watching as their hopes of immigrating to the United States slip away.  But because those hopes were dashed by forces outside of defendants' control, plaintiffs cannot show that defendants substantially increased their risk of non-adjudication through unreasonable delay—and plaintiffs thus lack an

imminent injury to support standing.  This Court has no power to intervene on plaintiffs' behalf to right what turns out to be a nonjusticiable wrong.

Even assuming <u>arguendo</u> that plaintiffs do have standing to pursue their unreasonable delay claims under the APA and Mandamus Act, a brief look at the standard for those claims convinces the Court that plaintiffs are unlikely succeed on the merits anyway.  The APA "imposes a general but nondiscretionary duty upon an administrative agency to pass upon a matter presented to it 'within a reasonable time' and authorizes a reviewing court to 'compel agency action unlawfully withheld or unreasonably delayed.'"  <u>Mashpee Wampanoag Tribe Council, Inc. v. Norton</u>, 336 F.3d 1094, 1099 (D.C. Cir. 2003) (internal citations omitted) (first quoting 5 U.S.C. §§ 555(b), then quoting 5 U.S.C. § 706(1)).  To assess the merits of an unreasonable delay claim, courts in this District apply the six-factor test set forth by the D.C. Circuit in <u>Telecommunications Research & Action Center v. FCC</u> ("<u>TRAC</u>"), 750 F.2d 70, 80 (D.C. Cir. 1984):

> (1) the time agencies take to make decisions must be governed by a rule of reason;
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
>
> (4) the effect of expediting delayed action on agency activities of a higher or competing priority;
>
> (5) the nature and extent of the interests prejudiced by delay; and
>
> (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

<u>In re United Mine Workers of Am. Int'l Union</u>, 190 F.3d 545, 549 (D.C. Cir. 1999) (cleaned up) (quoting <u>TRAC</u>, 750 F.2d at 80); <u>see also</u> <u>Skalka v. Kelly</u>, 246 F. Supp. 3d 147, 152 (D.D.C. 2017) (applying <u>TRAC</u> factors to claim for mandamus relief relating to visa petition processing).

In this case, as in other DV21 cases that have come before courts in this Circuit, plaintiffs' unreasonable delay claim falters on TRAC factor four.  "The D.C. Circuit has emphasized the 'importance of competing priorities in assessing the reasonableness of an administrative delay.'" Pushkar, 2021 WL 4318116, at *6 (quoting Mashpee Wampanoag, 336 F.3d at 1100).  "[E]ven where all other TRAC factors favor[] relief," courts in this Circuit strongly disfavor unreasonable delay claims effectively seeking "a judicial order putting [plaintiffs] at the head of the queue [and] simply mov[ing] all others back one space."  Id. (quoting In re Barr Laboratories, Inc., 930 F.2d 72, 75 (D.C. Cir. 1991)); see also Xiaobing Liu v. Blinken, Civ. A. No. 21-629 (TJK), 2021 WL 2514692, at *7 (D.D.C. June 18, 2021) ("This factor not only favors Defendants, but ends up altogether dooming Plaintiffs' claims of unreasonable delay.").

Expediting plaintiffs' interviews and adjudications such that they occur within the next day—apart from ordering a practical impossibility—"would allow Plaintiff[s] to proceed to the front of the queue of other similarly-situated diversity visa applicants—and applicants for other visa categories—who have not yet received an interview appointment."  Pushkar, 2021 WL 4318116, at *6 (citing Verma v. USCIS, Civ. A. No. 20-3419 (RDM), 2020 WL 7495286, at *9 (D.D.C. Dec. 18, 2020)).  Indeed, fast-tracking plaintiffs to the front of the line at this point in time would necessarily take away another applicant's already-scheduled interview slot—no doubt a precious commodity at this, the eleventh hour.  Likewise, reserving DVs for plaintiffs on an individual basis to be adjudicated beyond the statutory deadline would award them an unfair windfall, effectively leapfrogging their applications over the thousands of DV21 selectees who have already been deemed documentarily qualified, hold lower lottery numbers, and whose chances of adjudicating their applications will also expire on September 30.  Plaintiffs have not shown that they have been singled out for unfair treatment, nor have they sought broad relief for a

group of similarly situated applicants.  Awarding them special, extra-statutory treatment, then, would have the same line-jumping effect as placing them in the front of the queue.[2]

As discussed above, there are more than a thousand DV21 applicants ahead of plaintiffs in the processing queue for Moscow alone.  Plaintiffs' requested relief would inescapably have them bypass those other applicants, and their attempts to fight this fact are unpersuasive.  For one, plaintiffs attempt to evade the caselaw discussed above by distinguishing such cases as applicable only to applicants whose "eligibility . . . does not expire at the end of the fiscal year."  See Pls.' Reply at 17–18.  But this argument actually cuts against plaintiffs: precisely because of the imminent expiration date of DV21, all selectees for this year's lottery have a strong interest in keeping their place in line relative to plaintiffs.  And the order assigned to DV21 applicants is tied in turn to Congress's requirement "that the processing of diversity visas proceed in a random order."  See Gomez III, 2021 WL 3663535, at *24; 8 U.S.C. § 1153(e)(2) (DV numbers "shall be issued to eligible qualified immigrants strictly in a random order . . . for the fiscal year involved" (emphasis added)).  Plaintiffs' requested relief would disrupt that congressional scheme by disturbing the random order determined for DV21, contravening the principle that a court's "equitable discretion must not frustrate Congress's ends."  See Boland v. Wasco, Inc., 50 F. Supp. 3d 15, 19–20 (D.D.C. 2014) (citing Albemarle Paper Co. v. Moody, 442 U.S. 405, 409 (1975)).

Plaintiffs' attempt to distinguish their case from other similar cases denying the type of relief sought here by reference to "factual statistics" also falls flat.  See Pls.' Reply at 18.  Their argument on this score is backward-looking, focusing on the disproportionate impact COVID-19 has had on DV processing relative to other, higher-priority family visa categories.  See id. at 18–19. But TRAC factor four looks forward, focusing on "the effect of expediting delayed action" on

---

[2] Indeed, the Court is not convinced it even has the authority to disrupt the specific statutory deadline established by Congress.  Even if it did, the circumstances of this case would not warrant such drastic action.

other activities.  Plaintiffs' statistical arguments might be relevant to TRAC factors one and two, but they do not salvage plaintiffs' unreasonable delay claims from likely failure on the merits under factor four.

Finally, plaintiffs' cite Filazapovich for the proposition that they are not seeking "a simple reorganization of the Department's priorities" but rather "a rectification of Defendants' decision to flout the INA by sitting on its [sic] hands," Pls.' Reply at 19 (quoting Filazapovich, 2021 WL 4127726, at *20).  To be sure, courts have found TRAC factor four to favor certain plaintiffs, and those courts have entertained and even granted the extraordinary relief of reserving DVs for such plaintiffs to be adjudicated beyond the September 30 statutory deadline.  See Rai, 2021 WL 4439074, at *15; Filazapovich, 2021 WL 4127726, at *26.  But those cases are inapposite.  The plaintiffs in both Filazapovich and Rai sought relief from defendants' "no visa" policies, which were found to have directly and unequivocally barred the adjudication of the plaintiffs' otherwise qualified and current DV applications.  See Rai, 2021 WL 4439074, at *8–9; Filazapovich, 2021 WL 4127726, at *16.  This case, conversely, is decidedly not one where plaintiffs' alleged injury can be attributed to "defendants' decision to flout the INA by sitting on its hands."  Indeed, as discussed above, this is not even a case where plaintiffs are likely to demonstrate standing.  Even assuming the remaining TRAC factors weigh in plaintiffs' favor, factor four's heavy weight against them all but precludes their unreasonable delay claims from succeeding on the merits.

## Conclusion

Plaintiffs' failure to show a likelihood of success on the merits alone dooms their motion for a temporary restraining order.  The Court need not address the remaining factors,[3] nor

---

[3] The Court notes, as defendants point out, see Defs.' Opp'n & MTD at 53–54, that plaintiffs' "extensive delay in seeking a preliminary injunction weighs heavily against a finding of irreparable harm." Maldonado v. District of Columbia, Civ. Case No. 10-1511 (RJL), 2019 WL 6877913, at *3 (D.D.C. Dec. 16, 2019); Cayuga Nation v. Zinke, 302 F. Supp. 3d 362, 373 (D.D.C. 2018) ("[A]n unexcused delay in seeking extraordinary injunctive relief may

defendants' remaining arguments against granting emergency relief.  For the foregoing reasons, the Court will deny plaintiffs' motion for a temporary restraining order and/or preliminary injunction.  A separate Order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated:  September 29, 2021

---

be grounds for denial because such delay implies a lack of urgency and irreparable harm." (quoting Newdow v. Bush, 355 F. Supp. 2d 265, 292 (D.D.C. 2005))); see also, e.g., Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P., 1:21-cv-00038-MKV, 2021 WL 535485, at *6 & n.6 (S.D.N.Y. Feb. 12, 2021) (collecting cases).  The strictures of the September statutory deadline looming over this case are unforgiving, and plaintiffs knew as much, yet they—unique among DV21 plaintiffs as far as the Court can tell—waited until less than two weeks before that deadline to file suit.